Filed 4/14/21  P. v. Vigil CA2/2

## **NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALBERT VIGIL,<br><br>    Defendant and Appellant. | B294098<br><br>(Los Angeles County<br>Super. Ct. No. BA468730) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Henry J. Hall, Judge.  Affirmed.

Alison Minet Adams, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

Albert Vigil (defendant) appeals his conviction by jury of four felonies: count one – criminal threats in violation of Penal Code section 422,[1] subdivision (a); count two – stalking in violation of section 646.9, subdivision (a); count three – vandalism in violation of section 594, subdivision (a); and count four – robbery in violation of section 211. The jury also found true defendant's prior convictions: kidnapping in violation of section 207 and assault with a firearm in violation of section 245, subdivision (a)(2). Defendant represented himself throughout most of trial.

## CONTENTIONS

Defendant contends on appeal that there was insufficient evidence to support his convictions for criminal threats, stalking, and second degree robbery. He further contends his due process rights were violated in several ways. First, defendant challenges the trial court's admission of propensity evidence and refusal to bifurcate defendant's prior convictions. Defendant also asserts judicial bias, claiming, among other things, that he was denied the right to a fair trial on the issue of his prior convictions, due to a comment made by the court. Further, defendant asserts violations of his constitutional right to present a defense due to his investigator's failure to subpoena 22 witnesses and the court's failure to sua sponte appoint advisory counsel. Finally, defendant asserts that he was entitled to mental health diversion pursuant to section 1001.36.

## PROCEDURAL HISTORY

On September 6, 2018, defendant was convicted after a jury trial of making criminal threats (§ 422, subd. (a)); stalking

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

(§ 646.9, subd. (a)); vandalism (§ 594, subd. (a)); and second degree robbery (§ 211). The jury also found the prior allegations true. The prior allegations included simple kidnapping (§ 207) and assault with a firearm (§ 245, subd. (a)(2)).

On October 1, 2018, defendant was sentenced to 70 years to life plus seven years four months.

On November 21, 2018, defendant filed a notice of appeal.

## STATEMENT OF FACTS

### Prosecution evidence – case in chief

#### Lijuan

Lijuan came to the United States in 2013 and met defendant in 2017, while she was working in a mall. Defendant, who is six feet five inches tall, approached Lijuan and spoke to her. He subsequently returned to her workplace many times. Eventually Lijuan gave defendant her phone number and they began dating in September 2017.

Lijuan never brought defendant to her home. However, once, defendant grabbed Lijuan's driver's license and wrote down her home address. Later, defendant accurately and in detail, described to Lijuan the inside of her bedroom. Lijuan never brought defendant to her college campus, yet after a day in October, when she had walked to her car with her professor who had a beard, defendant later asked Lijuan, "Are you going somewhere with a guy with a big beard?"

By November Lijuan wanted to break up with defendant. When she told him this, defendant hit Lijuan with his fist on her face and her left ear a number of times. He also strangled her to the point that she was unable to breathe and lost consciousness for a few seconds. When she regained consciousness, defendant cut her hair and vandalized her car. While he was cutting her

3

hair, defendant told her he wanted her to look ugly. Defendant said if she broke up with him, he would cut off all her hair. Defendant vandalized Lijuan's car with a tool that he used to scratch the front windshield, the side mirrors, the speedometer, and the leather interior, causing more than $6,000 in damage.

During this incident, defendant told Lijuan that he would hurt her if she broke up with him. Defendant told Lijuan all the things he had done to his ex-girlfriends who tried to break up with him, including having thrown his former ex-girlfriend out a third floor window to the ground, causing her permanent injury. Lijuan understood this to mean that he would do the same thing to her if she tried to break up with him. Lijuan was "very terrified" when defendant told her this story.

Because she was afraid defendant would hurt her again, Lijuan did not immediately go to the police after the November 2017 incident. Still defendant returned to Lijuan's work every week, more than five times per week. In order to avoid defendant, Lijuan changed her daily routine, including the routes she took to work and the time she would leave. Because Lijuan would not answer his phone calls, defendant went to Lijuan's workplace at the end of December. When defendant saw a photo of a man on her phone, he became upset and snatched Lijuan's phone out of her hand. Lijuan was scared. Defendant never returned her phone.

At the end of December 2017, Lijuan went to the police. From a new phone, Lijuan retrieved her messages from that day and played them for the police. Defendant had called her 45 times in two hours. Defendant's messages included warnings such as "You know you shouldn't be doing what you're doing"; "I think you're doing something you shouldn't be doing"; "don't be a

4

bad girl"; and "I don't know what the hell you're doing, but I don't like it." The messages made Lijuan "very, very scared." Lijuan informed the police that defendant had pushed a pill into her mouth and forced her to have sex.

**Propensity evidence**

<u>Evelyn</u>

Evelyn moved to the United States from the Philippines in 1989 and began dating defendant in 1990. Defendant was over a foot taller than Evelyn, who was five feet. Soon after they began dating, defendant became jealous of Evelyn's friends and became violent. On one occasion, defendant went to Evelyn's workplace, punched her car, breaking the windshield, and punched Evelyn in the face. After that incident, defendant drove Evelyn to and from work and was always with her when she was not at work.

Defendant hit Evelyn on three or four occasions. Evelyn wanted to break up with defendant, but she was afraid of him. She called the police and reported that he punched her. When she told defendant there was a hearing that they had to attend, defendant picked her up from work and forced her to have sex with him while he videotaped it. He refused to "pull out" in order to teach her a lesson, which resulted in her getting pregnant.

Evelyn left defendant and moved in with her parents in San Diego. Evelyn returned to defendant's apartment the next month to get some of her belongings and tell him she was pregnant. Evelyn called her friend from defendant's apartment while defendant listened in on the line. Evelyn's friend said, "What are you doing there? I thought you were with Nathan?" Upon hearing a man's name, defendant became violent. He punched Evelyn in the face with closed fists 15 to 20 times. When she asked why he was punching her, defendant stated that

5

it was because of what her friend said. Defendant took all of Evelyn's clothes so that she could not leave. Defendant aimed a gun at Evelyn and told her he was going to kill her. Evelyn believed he was serious and she was scared.

Defendant kept Evelyn trapped in the bedroom for two to three days. One evening defendant tried to kill Evelyn by putting a pillow over her face and holding it down with all his weight. After some time, defendant said, "It's taking too long for you to die. Tomorrow I'll drown you in the bathtub." Defendant told Evelyn he had killed someone and buried him in his backyard.

Evelyn decided to jump out of defendant's second story window to escape. She waited until defendant fell asleep, then stood in the second story window to attempt to get people walking by below to help her. Defendant woke up, asked her what she was doing, and started to get up. Fearing defendant, Evelyn jumped out the window. Evelyn was in pain and could not feel her legs. Defendant ran downstairs, picked her up, brought her back into his apartment, and put her on the couch. Defendant refused Evelyn's pleas to call 9-1-1. Defendant called his father, who told him to call 9-1-1, and defendant finally complied. Defendant told Evelyn not to tell anything to the police or he would kill her. Defendant left the premises and was gone when the ambulance arrived.

Evelyn spent three to four weeks in the hospital and had two back surgeries. Her leg was broken and her heel was crushed, which caused a permanent limp. While she was in the hospital she told the police what happened. Evelyn spent a month in rehabilitation.

### Lynne

Lynne met defendant when she was working in the mall. They began dating. Defendant had a "black belt" and was much bigger than Lynne. After a month of dating, defendant became violent. When Lynne tried to stop defendant from going through the contents of her purse, he threw her on the ground and straddled her chest by her neck to pin her down with his legs. Lynne tried to scream and defendant covered her nose and mouth with his hands to smother her. She was unable to breathe.

Defendant continued to go through the contents of Lynne's purse and was upset when he found two condoms. Defendant claimed that condoms came in packs of three. Lynne grabbed her belongings and left, telling defendant she never wanted to see him again.

As soon as Lynne got home, defendant called her. Defendant began calling Lynne at home and at work between 20 to 30 times a day. After many calls, Lynne finally answered. When defendant apologized, Lynne agreed to give him another chance. Defendant did not have a car, so Lynne drove to his house to pick him up. When she arrived, defendant was asleep. She told him that if he was tired they could go on a date another day. He screamed, "No," grabbed her, held her on the ground, and sexually assaulted her. Lynne was scared and tried to keep him calm while she got out the door as fast as she could.

Defendant called her and said he was going to come after her. When previously going through her purse, defendant had found Lynne's address on her driver's license. She never told him where she lived. Defendant came to her house and hid in the bushes. When she came home that night, defendant came out of the bushes and told her, "Now I know where you live." Lynne's

father chased defendant with a gun, and defendant called the police, who arrested Lynne and her father for weapon possession. The charges were dropped the next day when Lynne told the police that defendant was stalking her.

Lynne got a restraining order against defendant. Defendant continued to call her for a few months, then stopped calling.

**Defense evidence**

Detective Goodreau testified to an error in a police report.

Defendant did not testify.

DISCUSSION

## I. Substantial evidence supported the verdict on counts one, two and four

Defendant challenges the sufficiency of the evidence to support his convictions for criminal threats (count one); stalking (count two); and second degree robbery (count four).

In reviewing these challenges to defendant's convictions, we examine the entire record in the light most favorable to the prosecution. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Our role is to determine whether the record contains evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Id.* at pp. 576-577.)

### A. *Count one – criminal threats, section 422*

Section 422 provides, in pertinent part:

"Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of

8

actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . , shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.”

Defendant argues that the evidence did not show any clear or immediate statement, or verbal threat, as required by section 422.  Defendant argues that while the evidence shows that he hit and choked Lijuan, and told her scary stories of his earlier crimes, there was no evidence of a verbal threat against her other than a threat that he would cut her hair, which is not a threat to do serious bodily injury.

Defendant points to the following testimony in the record:

“Q:  What did he say exactly?

“A:  He told me all the things he did to his ex-girlfriends who tried to break up with him.  He said he hurt their personal safety.  He also hurt – also damaged their properties.

“Q:  Did you take that to mean that he would do the same to you if you tried to break up with him?

“A:  Yes.

“Q:  And did he ever specifically tell you if he would hurt you if you broke up with him?

“A:  He did not say that specifically, but his behavior, his behavior, he actually did it.”

Defendant asserts that he cannot be guilty of criminal threats on this evidence because a criminal threat is a crime of communication, not of conduct.  Defendant cites *People v. Felix*

9

(2001) 92 Cal.App.4th 905, 914, for the proposition that " 'mere angry utterances or ranting soliloquies, however violent,' " do not, by themselves, constitute criminal threats. Thus, defendant argues, Lijuan's testimony was insufficient to provide proof beyond a reasonable doubt of a criminal threat in violation of section 422.

In *People v. Toledo* (2001) 26 Cal.4th 221, the Supreme Court enumerated the factors that the prosecution must establish in order to prove a violation of section 422: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat – which may be 'made verbally, in writing, or by means of an electronic communication device' – was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*Toledo,* at pp. 227-228.)

The high court clarified that the requirement that the threat be " 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat,' " meant that " ' "unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently

10

present in the threat and surrounding circumstances." ' " (*In re George T.* (2004) 33 Cal.4th 620, 635.) In other words, "[a] communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning. [Citation.]" (*Id.* at p. 635.) The communication need not " 'communicate a time or precise manner of execution.' " (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.) Instead, "the meaning of the threat by defendant must be gleaned from the words and all of the surrounding circumstances." (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218.) A person violating section 422 must intend "that the victim receive and understand the threat, and the threat must be such that would cause a reasonable person to fear" for her safety. (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424.) Nonverbal conduct, such as making a gesture with a hand, falls outside of the scope of section 422. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1147.)

Convictions under section 422 have been upheld where the verbal threat at issue is nonspecific. For example, in *People v. Mendoza* (1997) 59 Cal.App.4th 1333, the defendant told an individual that she had " 'fucked up his brother's testimony,' " and that " '[h]e was going to talk to some guys from Happy Town [criminal street gang].' " (*Id.* at p. 1337.) Although the defendant's words did not convey a specific crime resulting in death or serious injury, the *Mendoza* court found that the surrounding circumstances, along with the words, supported the jury's determination that a criminal threat had been made. (*Id.* at pp. 1341-1342; see also *People v. Butler, supra*, 85 Cal.App.4th at pp. 753-755 [upholding criminal threat where defendant told

11

victim she needed to mind her own business or she was " 'going to get hurt' "].)

Here, reviewing the record in the light most favorable to the prosecution, as we must (*People v. Johnson, supra*, 26 Cal.3d at p. 576), the words that defendant spoke to Lijuan, in combination with the surrounding circumstances, were sufficient to convey a criminal threat. First, we consider the circumstances under which defendant conveyed the threat. Lijuan was attempting to break up with defendant. At trial, while Lijuan explained the incident to the jury, the following exchange took place:

"Q: Did he ever say he was going to hurt you or do anything to you if you broke up with him?

"A: Yes, he did.

"Q: Was this in the car during this incident?

"A: Yes.

"Q: What did he say exactly?

"A: He told me all the things he did to his ex-girlfriends who tried to break up with him. He said he hurt their personal safety. He also hurt – damaged their properties.

"Q: Did you take that to mean that he would do the same to you if you tried to break up with him?

"A: Yes."

This exchange took place immediately preceding the exchange on which defendant relies, quoted above, in which Lijuan then stated that defendant did not specifically say that he would hurt her. Thus, it appears that there was conflicting testimony on this issue, and the jury was entitled to believe Lijuan's initial statement that defendant said he would hurt her. Further, the jury was entitled to find that defendant's description

12

of what he had done to his ex-girlfriends when they broke up with him signified his intention that Lijuan "receive and understand the threat," and reasonably be in fear that defendant would take such action against her.  (*People v. Thornton, supra*, 3 Cal.App.4th at p. 424.)

Although Lijuan later stated that defendant did not specifically tell her that he would hurt her if she broke up with him, it was not necessary that defendant say these exact words in order to communicate the threat.  The surrounding circumstances, in combination with defendant's description of his past violent acts against women who tried to break up with him, provided an " 'unequivocal, unconditional, immediate, and specific . . . prospect of execution of the threat.' "  (*People v. Toledo, supra*, 26 Cal.4th at p. 227.)  Lijuan was attempting to break up with defendant.  At that time, defendant not only physically beat her and vandalized her car, he described the violent acts he had committed against prior girlfriends when they tried to break up with him.  Defendant's verbal communication of how he behaved when women broke up with him, reasonably instilled in Lijuan a fear that she was facing a threat of the same kind of physical harm.

In enacting section 422, the Legislature expressed an intent that every person " ' "be secure and protected from fear, intimidation, and physical harm caused by the activities of violent groups and individuals." ' "  (*People v. Martinez, supra*, 53 Cal.App.4th at p. 1217.)  Lijuan was justified in feeling fear at defendant's words under the circumstances of this case.  Sufficient evidence supported the jury's verdict finding that the prosecution proved the elements of this crime.

**B.** *Count two – stalking, section 646.9*

Section 646.9, subdivision (a), provides:

"Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison."

Defendant argues that there was insufficient evidence to support a conviction of count two because the evidence of a credible threat was missing. The statute defines a "credible threat" as:

"[A] verbal or written threat, including that performed through the use of an electronic device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).)

Thus, "the 'credible threat' required for conviction under section 646.9 may be implied from a course of conduct." (*People v. Lopez* (2015) 240 Cal.App.4th 436, 449 (*Lopez*).) A course of conduct may constitute a credible threat where such conduct

14

"reveal[s] an obsession that a reasonable person would understand as threatening." (*Id*. at p. 453.)

The threat evidence for count two consisted of defendant's conduct during his relationship with Lijuan. Although Lijuan never gave defendant her address, defendant took her driver's license and wrote down her address, later describing to Lijuan her bedroom and its contents. Although Lijuan never took defendant to her college campus, defendant observed her walking with a bearded man on campus. When Lijuan attempted to break up with defendant, he became violent and told her of the violence he had inflicted on previous girlfriends when they tried to break up with him. He told Lijuan he would hurt her if she broke up with him. Lijuan was terrified, and believed he was threatening her life. After his attack on Lijuan, defendant came to her work five times a week and called her 30 times a day. Because defendant was following her, Lijuan changed her routines in order to avoid him. When Lijuan did not answer his telephone calls, defendant came to her work and took her cell phone. After defendant left Lijuan 45 disturbing messages in two hours, Lijuan went to the police to report defendant's conduct. The voice messages included warnings that Lijuan "shouldn't be doing what [she was] doing" and accusing her of being a "dirty girl."

Defendant points out that Detective Goodreau provided his opinion that these messages did not count as criminal threats but were perhaps better described as "annoying" or "harassing." Nevertheless, the jury presumably considered the phone messages in the context of defendant's course of conduct towards Lijuan. (*Lopez, supra*, 240 Cal.App.4th at p. 449.) Overt threats are not necessary to establish a credible threat within the meaning of section 646.9 when the defendant's pattern of conduct

15

is such that the target of the threats reasonably fears for her safety. (*Lopez, supra,* at p. 453.) In *Lopez,* for example, the defendant persistently sent his victim messages, letters and packages over the course of many years. Although these communications lacked any overt threat, they "reveal[ed] an obsession that a reasonable person would understand as threatening." (*Ibid.*) Similarly, in *People v. Falck* (1997) 52 Cal.App.4th 287, the defendant's communications revealed an "obsessive desire to engage in sexual acts with the victim" and "an obsessive desire to marry her and be with her." (*Id.* at p. 298.) These communications reasonably caused the victim to fear the defendant and thus conveyed a credible threat. (*Ibid.*)

Although his communications were not consistently overtly threatening, defendant's course of conduct here was such that a reasonable person would understand it as threatening. Under the circumstances, the evidence supported the jury's conviction for stalking.

### C. *Count four – robbery, section 211*

Robbery is the taking of property from the person of another, "and against his will, accomplished by means of force or fear." (§ 211.) Defendant argues that there was no evidence that defendant used force or fear to take Lijuan's phone, as even she described the incident as "he snatched my cell phone . . . from my hand." Because Lijuan did not say that defendant used force or fear to take the phone, defendant argues, the robbery conviction must be reversed for insufficient evidence.

The words "force" and "fear" as used in the statute "have no technical meaning peculiar to the law and must be presumed to be within the understanding of jurors." (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1708.) However, " '[f]orce' is a relative

16

concept." (*Id.* at p. 1709.) In determining whether force has been applied in a particular situation, "the defendant's physical characteristics in comparison to those of the victim may . . . be particularly relevant." (*Ibid.*) Further, "any force sufficient to overcome a victim's resistance will necessarily be more force than required to seize the property." (*People v. Hudson* (2017) 11 Cal.App.5th 831, 839.)

There was sufficient evidence in the record to support the jury's finding that defendant's act of "snatching" Lijuan's phone was carried out by means of force or fear. Lijuan testified that defendant was six feet five inches. She also testified at various points that she was scared or terrified of defendant. At the time that he took her phone, defendant had already punched her, strangled her, and threatened to do more physical violence to her. When he came to the store where Lijuan worked, Lijuan was aware that he was there because she had previously not answered his calls. Defendant grabbed Lijuan's cell phone from her hand. Lijuan was asked, "When he came into your store and took your phone were you scared?" Lijuan answered, "Yes."

The jury was entitled to conclude from this evidence that defendant used force or fear during his theft of Lijuan's cell phone. He was a large man, and he had assaulted Lijuan in the past. Lijuan testified that she was scared when he came to her place of work and grabbed her phone from her hand. The evidence supported the jury's conviction for robbery.

## II. Propensity evidence properly admitted

Evidence Code section 1109 provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence

17

Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." "The rationale underlying [section 1109] is that by admitting evidence of a defendant's other acts of domestic violence to show a disposition to commit acts of domestic violence, the statute eliminates any presumption that 'the charged offense was an isolated incident, an accident, or a mere fabrication.' " (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1075 (*Wang*).)

Defendant argues that the trial court wrongfully admitted the propensity testimony because he was not accused of an offense involving domestic violence. Instead, defendant was accused of stalking, robbery, and vandalism. Defendant argues that in carrying out the Evidence Code section 1109 analysis, the court neglected to make the threshold finding that either this case, or the prior case, involved domestic violence.

First, the record shows that defendant has forfeited this claim by failing to raise it in the trial court. (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1141-1142 [defendant forfeited argument that prior offense was inadmissible because it was not an act of domestic violence].) Defendant argues that it was not forfeited because an objection at trial would have been futile. (Citing *People v. Boyette* (2002) 29 Cal.4th 381, 432.) Defendant suggests that facts indicated an objection to this judge would have been futile, but he fails to specify the facts which would indicate that the court would have admitted the evidence regardless of defendant's objection. An objection at trial would have given the trial court an opportunity to consider defendant's argument that neither crime involved domestic violence. Because defendant did not provide the court an opportunity to address his objection, it is forfeited on appeal.

18

Further, even if considered, the trial court's admission of the propensity evidence under Evidence Code section 1109 was permissible.  Evidence admissible under this section is not limited to actual charges of domestic violence.  "[T]he plain language of Evidence Code section 1109, subdivision (a), . . . expressly 'allows the introduction of prior domestic crimes evidence "in a criminal action in which the defendant is accused of an offense *involving* domestic violence." ' [Citation.]" (*Wang, supra*, 46 Cal.App.5th at p. 1077.)  "To 'involve' commonly means ' "to include, contain, or comprehend within itself or its scope." ' [Citation.]  Thus, being ' "accused of an offense involving domestic violence" ' encompasses a broader range of conduct than the domestic violence defined as abuse committed against one of certain specified individuals under Penal Code section 13700." (*Ibid.*)

"[Evidence Code] [s]ection 1109 does not contain an enumerated list of offenses which are defined as those 'involving' domestic violence." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1234.)  However, the term "domestic violence" "has the meaning set forth in Section 13700 of the Penal Code." (*Ibid.*)  That section defines "domestic violence" as "*abuse* committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or *is having or has had a dating or engagement relationship*." (§ 13700, italics added.)  Thus, we need not consider the specific charges when deciding whether propensity evidence is admissible under Evidence Code section 1109, if any of the charges against the defendant involve some form of domestic violence, including abuse of an individual with whom the defendant has a dating relationship.

Here, defendant had a dating relationship with Lijuan. There is no requirement that their relationship be a "'serious courtship,' an 'increasingly exclusive interest,' [a] 'shared expectation of growth,' or that the relationship endures for a length of time." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1116.) Nor does the definition of a dating relationship "preclude a relatively new dating relationship." (*Ibid.*) Instead, the Legislature intended that "the domestic violence statutes should apply to a range of dating relationships." (*Ibid.*) The evidence before the court showed that the relationship between Lijuan and defendant was a dating relationship, and that the case "involve[ed] domestic violence." (Evid. Code, § 1109.)

Defendant further argues that Evelyn's testimony should have been excluded pursuant to Evidence Code section 1109, subdivision (e), which provides that "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." Defendant argues that Evelyn testified more than 10 years after the events in question, and the court never made a finding that the interests of justice required the admission of her testimony.

However, this court may imply a finding that the interests of justice required admission of Evelyn's testimony. An appellate court implies " 'all findings necessary to support the judgment, and [its] review is limited to whether there is substantial evidence in the record to support these implied findings.' " (*People v. Francis* (2002) 98 Cal.App.4th 873, 878.) Because Evelyn's testimony involved similar acts on the part of defendant against a woman with whom he had a dating relationship, it was admissible and the trial court did not err by implicitly

determining that its admission served the interests of justice under the circumstances of this case.

### III.  No error in declining to bifurcate prior convictions

Before trial, defendant made a request to bifurcate of the trial of his prior convictions.  The court denied the request, stating:

"There's been a request for bifurcation of the trial on the priors.  I don't think that would be appropriate in this case anyway.

"There's a motion to put on or we're all aware that the People intend to put on evidence pursuant to Evidence Code section 1109 of past actions.

"I have heard [defendant] discussing that with his investigator earlier this morning, but bifurcation would not be appropriate in this case because the jury's going to hear this information anyway.

"Secondly, there's been no objection to the [Evidence Code section] 1109 evidence, but I do want the record to reflect that I've gone through the file in the SA case and, while any of this information obviously is prejudicial to the defendant, after having weighed it I do think that its probative value outweighs its prejudice.

"There's a huge issue in this case regarding intent and I think that evidence is highly probative to the intent issue.  Even though there's no objection I would hav[e] admitted it over objection having reviewed it."

A redacted minute order was admitted showing defendant had been convicted after he pled guilty in 2009 of section 207, subdivision (a) (kidnapping) and section 245, subdivision (a)(2) (assault with a firearm) for crimes committed in 1990, and that

21

he was paroled in 2012.  The jury found true that defendant had been convicted in 2009 of sections 207 and 245.

A trial court has the authority to bifurcate trial issues under section 1044, which gives the trial judge "broad discretion to control the conduct of a criminal trial." (*People v. Calderon* (1994) 9 Cal.4th 69, 74-75).  Thus, the standard of review for the denial of a motion to bifurcate is abuse of discretion.  (*Id.* at p. 78.)  The denial of a defendant's request to bifurcate may be an abuse of discretion "where admitting, for purposes of sentence enhancement, evidence of an alleged prior conviction during the trial of the currently charged offense would pose a substantial risk of undue prejudice to the defendant." (*Ibid*.)  However, bifurcation is not required in every instance.  "Perhaps the most common situation in which bifurcation of the determination of the truth of a prior conviction allegation is *not* required arises when, even if bifurcation were ordered, the jury still would learn of the existence of the prior conviction before returning a verdict of guilty." (*Ibid*.)

Here, the trial court's denial of defendant's request to bifurcate was based on the very reason approved in *People v. Calderon, supra*, 9 Cal.4th at page 78.  A bifurcation would have been of minimal value because the jurors would inevitably have learned of the prior conduct due to the admissible propensity evidence.  We therefore find no abuse of the trial court's discretion.

Defendant cites *People v. Partida* (2005) 37 Cal.4th 428 as support for his position that the trial court's decision not to bifurcate his priors was a due process violation.  In *Partida*, the high court held that a defendant who objects to the admission of evidence at trial may argue on appeal that the admission of that

evidence violated his due process rights. However, a defendant may only make a "very narrow due process argument on appeal. He may argue that the asserted error in admitting the evidence over his . . . objection had the additional legal consequence of violating due process." (*Id.* at p. 435.) The admission of evidence "violates due process only if it makes the trial fundamentally unfair." (*Id.* at p. 436.)

The trial court's failure to bifurcate the priors in this case did not render the trial fundamentally unfair. As set forth above, the propensity evidence was presented without objection. Thus, the jury was going to learn of the underlying conduct leading to those prior convictions in any event. Further, as set forth above, the jury was properly instructed as to how it was permitted to consider the prior convictions. No error occurred.

## IV. No due process violation of right to an impartial judge

### A. *The trial judge's purportedly biased actions*

Defendant argues that the trial judge was biased against him based on his prior record. Defendant sets out the purported "growing bias" of the trial judge throughout the trial based on several incidents.

First, at a pretrial conference, the trial court stated:

"In reviewing the file in this case, and particularly the prior conviction, I was concerned with whether the prior conviction involved issues that would fall under the *Vargas* case in terms of whether it actually constituted two strikes or whether it constituted one.

"I was also concerned about whether there was going to be an issue under Evidence Code section 1109.

"Because of that . . . I have reviewed that file and I'm going to say something that I have never said in my entire judicial

23

career and that is I'm not going to entertain a settlement offer in this case.

"Having reviewed that particular file I don't think that any settlement that involves anything less than a life sentence would be appropriate.

"So as far as I'm concerned this case should be considered as a case that's going to trial . . . the underlying circumstances of that SA case are such that I don't think a settlement in this case would be appropriate."

Next defendant points to the trial court's denial of his request to bifurcate defendant's prior convictions. Before jury selection, the court addressed several issues which had not been raised, in an effort for the "record to be clear on these" issues. One of the issues was defendant's request for bifurcation of trial on the priors. As set forth in detail above, the trial court did not think that bifurcation was appropriate in this case. The court reasoned that the jury was going to hear the evidence anyway through the prosecution's use of Evidence Code section 1109. The court proceeded to explain its position that the probative value of such evidence outweighed the prejudice.

Defendant next references several "disagreements" between defendant and the court that ultimately led to defendant's removal from the courtroom during the trial. When defendant asked the court about his witnesses, the court stated, "Actually I don't know anything about your witnesses. That's between you and your investigator." Defendant then complained that he never saw his investigator and the investigator did not communicate with him well. The court stated:

"I warned you several times about the dangers of representing yourself. And you chose to do that anyway and

24

that's fine.  Managing your investigator and managing your investigator's pursuit of witnesses is on you."

The court reminded defendant that he had "announced ready for trial" and indicated he was not going to waive time. The court then stated: "it's not up to me nor is it up to anybody other than you to ensure your witnesses are here."

After the jury had been sworn and given preliminary instructions, defendant asked to address the court and was permitted to do so at sidebar.  Defendant complained that he had not received certain witness transcripts.  After confirming with the prosecutor that the defendant had previously been given the material in question, the court admonished defendant, outside of the presence of the jury, as follows:

"If you don't stop talking over me you are done being pro per.  I've just about gotten to the end of my patience with this.

"I cut you a bunch of slack during voir dire when you were doing inappropriate things.  I cut you slack when you were excusing witnesses [*sic*] based on their racial background.  I have done everything to try to facilitate your representing yourself.

"I didn't say anything when you were attempting to improperly influence the jury by talking about the stakes in this case for you.

"I didn't stop you when you have been consistently talking about the fact this is the first time you've ever done this.  All of that is improper.  If you want to continue to represent yourself, which I assume you do – from here on out you're going to comply with the rules.

"This material was turned over to you and your defense team.  You didn't say one – put your hand down.

25

"You didn't say one word about not having any of this material before this trial started. You announced ready. You said that you weren't willing to waive time.

"Again, I have warned you probably a dozen times about the dangers of representing yourself."

Later, during the cross-examination of a prosecution witness, the court announced that the midafternoon recess would begin a few minutes early because the court had "some things to talk about with the litigants." After the witness and the jurors had left the courtroom, the court asked defendant for an offer of proof because defendant had been "cross-examining this witness for two hours now roughly and [had] not asked her a single question about anything that she testified to on direct." The court reminded defendant: "I have an obligation to both see to it you have an opportunity to cross-examine her, which you've done, but I also have an obligation to be sure that this trial moves forward and in some kind of sensible manner." The court admonished defendant: "I'm going to give you 10 minutes when we come back to get to something that has some relevance to this case. Otherwise, I'm going to cut you off."

When the witness returned to the stand, the court interrupted defendant's cross-examination, stating, "I'm going to give you one more minute. You've been at this for 12 minutes already." Shortly thereafter, the court indicated, "I'll sustain my own objection. That was your last question." Outside of the presence of the jury, the court again admonished the defendant, "this witness was one of the two or three civilian witnesses in this case. You had her on cross-examination for over three hours. I would say of that three hours maybe 15 minutes of it had

26

anything to do with the case whatsoever. I'm not going to tolerate it again."

Defendant asserts that the court permitted the prosecution to ask extremely leading questions, but prevented him from asking questions. When a witness's answers were evasive, the court would interfere with defendant's continued questioning, stating, "this is the answer you are going to get."

During a recess the court informed defendant he had only 15 minutes more with the witness. The court explained: "You're saying statements about what she's done here in court and it's essentially an undue consumption of time which I am not only allowed to do but duty bound to avoid. You have 15 minutes with this witness when we get back. Otherwise, I'm cutting you off."

Thereafter, the court told defendant, "you've used the time I've given you." The court then informed defendant that he was out of time. The court sustained its own objection, that a question had been asked and answered many times.

Defendant states that the court further showed its prejudice by overruling defendant's objection to the prosecution's requested redaction of a statement that defendant gave to investigators in a previous case. He informed the court that the redacted version omitted essential portions of the case:

"They put me through hell in that case. My attorney waived time with my objection, like five times and a whole bunch of stuff. And he basically threatened me to make a plea bargain. That's why he doesn't want them to see that."

The court responded that it was the conduct, not the conviction in the prior case that was important, and reserved ruling on defendant's objection.

During defendant's cross-examination of an officer, defendant attempted to ask that officer about the charges in defendant's prior case. The court informed defendant: "He was not the investigating officer. The jury will see what the disposition of that case was and what you were convicted and what was dismissed pursuant to a plea bargain." The court then asked that the prior charges be removed from the jury's sight. The court repeated to defendant that the officer on the stand was not involved in the prior case. Defendant proceeded to inquire: "Were you -- have you talked to anybody in the -- did you have any detective -- I mean some deputies go into my cell and beat me and say 'take the deal and get the hell out of here?'" At that point the court stopped defendant's questioning and asked the parties to approach the bench for a sidebar. Outside of the presence of the jury, the court stated:

"Okay, Mr. Vigil. You just walked over the line. I'm going to instruct this jury that there was never a deal offered in this case and that I stated on the record based on your past history I would not accept a deal. There was never a deal on the table ever, ever. Not once."

Defendant responded: "okay."

When the jury returned, the court provided the following instruction:

"Okay, ladies and gentlemen. I'm going to take judicial notice of the actions of this court, which I'm allowed to do, and I'm instructing you that, A, there was never a plea bargain offered in this case. B, all of the parties were informed early on that based on [defendant's] past history that I would not accept any kind of a settlement offer in this case. So that I'm taking

judicial notice of.  It's on the record of the case and those are the facts."

Finally, during defendant's examination of Detective Goodreau, defendant began asking the detective whether the detective was involved in various conspiracies, including a conspiracy to have defendant murdered.  This line of questioning led to the following exchange between the defendant and the court:

"Q:  Are you involved in any sheriff deputies coming into my cell beating me and saying, 'take the deal and get out of here?'

"The court:  I'm going to sustain the same objection.  I'm not going to readvise the jury what I advised them yesterday, but we went down this road.  It's cumulative.  It's improper.  It's not true.

"Q:  By the defendant.  Okay.  Were you aware that the judge told me that he's going to give me a life sentence[] in this case?

"The court:  Okay.  That's improper.

"The defendant:  170.6 motion.  Motion to fire the judge. You threatened to send me to prison for the rest of my life.

"The court:  Okay.  We're done.

"The defendant:  170.6 motion.  Motion to fire the judge. You're fired, Your Honor.

"The court:  It's untimely, Mr. Vigil.  It has to be filed 10 days before or within 10 days of the case being assigned here and it's been assigned here for a long time.  So we're done with that.

"The defendant:  You paid out the jury, Your Honor. They're going to send me to the – you're going to send me to prison for the rest of my life, Your Honor.

29

"The court: Ladies and gentlemen, I'll send you back into the jury room please. Ignore Mr. Vigil's comments.

"The defendant: So they're going to send me for the rest of my life. Mistrial. Everyone here is prejudiced against me. You've been biased this whole time."

After the jurors left the courtroom, the court instructed defendant that he was no longer representing himself pro. per. The court asked an attorney present to take the chair at counsel table. When the jury returned, the court informed the jury that defendant had been relieved of his ability to represent himself based on his behavior. The court admonished the jurors that they may not decide the case based on this or allow it to interfere with their judgment in any way.

After the lunch recess, defendant was not present in court. The court indicated: "The record should reflect Mr. Vigil's not present. He refuses to come out." The parties proceeded to review the jury instructions.

Defendant argues that these actions on the part of the court demonstrated the court's bias against him due to his decision to represent himself and his prior convictions involving domestic violence. Defendant asserts violations of his Sixth Amendment right to represent himself as well as his Fourteenth Amendment and Article 1 rights to a fair trial.

## B. *Applicable law*

"A fair trial in a fair tribunal is a basic requirement of due process." (*In re Murchison* (1955) 349 U.S. 133, 136.) "The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, disapproved on other grounds in *People v. Rundle* (2008) 43

Cal.4th 76, 151.) Due process is violated when the probability of bias on the part of a judge is so great as to become "constitutionally intolerable." (*Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868, 881.) On appeal, the court must assess whether any judicial misconduct or bias was so prejudicial that it deprived defendant of a " ' "fair, as opposed to a perfect, trial." ' " (*People v. Guerra, supra,* at p. 1112.)

### C. *Application to this case*

Defendant first raises the court's decision to take judicial notice of its own actions in refusing to accept a settlement offer in this matter. As set forth above, the trial court informed the jury that "there was never a plea bargain offered in this case" and "based on [defendant's past history]" the court refused to accept a settlement of any kind. Defendant argues that the court's actions removed key issues regarding defendant's priors from the jury and opened the door for the jury to speculate about defendant's possible punishment. Defendant describes the court's conduct as causing the jury to become immediately biased.

Preliminarily, defendant failed to object when the court informed him that it intended to instruct the jury "that there was never a deal offered in this case" and that "I would not accept a deal in this case based on your past criminal history." Instead of objecting, defendant responded, "okay." Defendant thus failed to preserve any objection to the court's act of informing the jury of this information. (*People v. Monterroso* (2004) 34 Cal.4th 743, 780 (*Monterroso*) [defendant failed to interpose a timely objection to the court's comments, therefore failed to preserve the issue for review].)

Further, the trial court is permitted under article VI, section 10 of the California Constitution to " 'make any comment

31

on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause.' " (*Monterroso, supra,* 34 Cal.4th at p. 780.) This provision has been interpreted to require that the court " ' "be accurate, temperate, nonargumentative, and scrupulously fair." ' " (*Ibid.*) The trial court may not " ' "withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate fact-finding power." ' " (*Ibid.*)

The record reveals that the judge felt its commentary was necessary for the proper determination of the matter. Defendant's actions suggested to the jury that there was a plea that the police were attempting to force defendant to take. The court was concerned that the jury would believe this false information. Thus, the court felt compelled to set the record straight by explaining that there was never a plea offered in this matter.

The court's comment did not take from the jury the issue of the truth of defendant's priors. In fact, the court later instructed the jury with CALCRIM No. 3550, which states: "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." We must assume that the jury followed this instruction. "Where the trial court instructs the jury that they can wholly disregard any comment by him, that they are the exclusive judges of the credibility of witnesses and of all questions of fact submitted to them, and that his comments were for the purpose of aiding the jury in reaching a verdict but not to compel one, there is no

reversible error in connection with the court's comments on the evidence." (*People v. Jones* (1970) 7 Cal.App.3d 48, 54-55.)

Defendant further argues, without citation to authority, that it was the judge's comments that opened the door to defendant's discussion of his possible punishment. This argument is pure speculation and lacks merit. Defendant had previously been admonished for referencing his possible punishment, so there is no indication that the judge incited this behavior. The trial court's comments were accurate and did not overstep its broad authority to comment on the evidence in the interests of making sure the jury was not under a misimpression regarding possible plea offers in the case.

Defendant argues that the court's other comments in the case amounted to a demonstration of bias against defendant in front of the jury. Defendant argues that the court continuously scolded him in front of the jury, misled the jury, mislabeled the case domestic violence, suggested defendant had the tendency to commit the crimes, and ultimately removed him as his own attorney after defendant asked the court to recuse himself.

Defendant argues that the court "should not himself give vent to personal spleen or respond to a personal grievance" because "justice must satisfy the appearance of justice." (*Offutt v. United States* (1954) 348 U.S. 11, 14.) In *Offutt*, "instead of representing the impersonal authority of law, the trial judge permitted himself to become personally embroiled with the petitioner. There was an intermittently continuous wrangle on an unedifying level between the two." (*Id.* at p. 17.) Here, in contrast, the trial court acted with patience towards defendant, giving him warnings before being forced to take steps to rein in defendant's misconduct. There is no suggestion in the record that

the court became personally embroiled with defendant or engaged in a continuous wrangle with defendant.  In short, nothing that the court did deprived defendant of a " ' "fair, as opposed to a perfect, trial." ' " (*People v. Guerra, supra*, 37 Cal.4th at p. 1112.)

## V.  Defendant's right to compulsory process was not violated

Defendant argues that it was ultimately the court's duty to ensure that defendant's witnesses were subpoenaed to appear in court.  In support of this argument, defendant cites *Washington v. Texas* (1967) 388 U.S. 14, 18, which held that "[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense." (*Ibid.*)

### A.  *Relevant trial proceedings*

Defendant's initial request to represent himself is not included in the record.  However, the court provided defendant with 10 hours of investigative services with the investigator of his choice.  The trial court also appointed standby counsel.  On August 28, 2018, defendant represented that he was ready for trial.

On August 29, 2018, when the court inquired whether defendant had any witnesses to list to the potential jurors, defendant told the court that he had 22 witnesses, and that he gave "descriptions" of these witnesses to his investigator.  Defendant was "worried" because his witnesses "were supposed to be subpoenaed" over a month earlier.

Toward the end of the prosecution's case, the court asked defendant whether he intended to testify.  Defendant inquired about his witnesses, saying, "Am I getting all these witnesses

34

here?"  When the court inquired whether defendant had subpoenaed them, defendant responded, "Well, I don't know where my private investigator is.  He was supposed to subpoena over 20 witnesses.  I don't know what happened."  The court informed defendant that it was his responsibility to subpoena them.

### B.  *Applicable law*

A criminal defendant also has " 'a right to the process of the court to compel the attendance of witnesses [by subpoena].' " (*Smith v. Superior Court* (2020) 52 Cal.App.5th 57, 76-77.)  This is true even if the defendant does not have the resources to pay for such process.  (*Ibid.*)  However, subpoenas must be initiated by a party to the litigation.  (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1318.)  "A defendant's constitutional right to compulsory process is violated when the government interferes with the exercise of his right to present witnesses on his own behalf.  [Citations.]" (*In re Martin* (1987) 44 Cal.3d 1, 30.)  In order to prove that his right to compulsory process has been violated, the defendant must show that there is "a causal link between the misconduct [of the court] and [the defendant's] inability to present witnesses on his own behalf." (*Id.* at p. 31.)  In addition, the defendant must make a plausible showing that the " 'testimony [of the witness] would have been both material and favorable to his defense.' [Citation.]" (*Id.* at p. 32.)

### C.  *Application to this case*

Defendant has failed to show a violation of his constitutional right to compulsory process in this case.  Defendant has failed to provide a list of the names of his critical witnesses.  He has failed to articulate the ways in which his witnesses would be material to his case.  Further, in the absence

of a list of the names of the witnesses, defendant has failed to show how the court could have subpoenaed them.

Even if defendant had articulated identifiable witnesses and prejudice, he would have to show that the court interfered with his right to present these witnesses. To do so, he would have to show a causal connection between the court's purported error and defendant's inability to present his witnesses.

Defendant cites *Roviaro v. United States* (1957) 353 U.S. 53 for the proposition that in certain circumstances, it is incumbent upon the prosecution to assist the defendant in procuring a witness. In *Roviaro,* the witness was a government informant who was only identified as John Doe. Thus, it was solely within the government's power to provide this witness to the defendant. Under the circumstances of that case, "the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of repeated demands by the accused for his disclosure." (*Id.* at p. 65.) In this case, the prosecution did not conceal any witness from defendant, therefore the case is inapplicable.

Defendant attempts to make a broader claim that he did not have reasonable access to ancillary services. He argues that the trial court had a sua sponte duty to provide him with advisory counsel, instead of just standby counsel. However, defendant fails to point to a citation to the record where he asked the court for advisory counsel. Because the record does not reflect a request by defendant to obtain advisory counsel, his appeal on this ground fails. (*People v. Garcia* (2000) 78 Cal.App.4th 1422, 1431 ["a defendant who has competently elected to represent himself should not be heard to complain that he was denied the assistance of advisory or stand-by counsel"].)

36

Even if he had requested advisory counsel at trial, "a defendant who elects to represent himself or herself has no constitutional right to advisory or stand-by counsel or any other form of 'hybrid' representation. [Citations.]" (*Id*. at p. 1430.)

Defendant has failed to make the required showings for a violation of his right to compulsory process, thus he has failed to show reversible error.

## VI. No error in denying defendant's mistrial motion

Defendant argues that a mistrial for bias was his only option at the time the judge removed him from acting as his own attorney. Defendant states that he did not know how to make a proper motion for mistrial, and that the court responded even more harshly when defendant made the motion. Defendant argues that it was improper for the court to fail to rule on his motion for mistrial, as defendant was still representing himself at the time of the motion. The court did not remove defendant as pro. per. counsel until after the jury left to return to the jury room. Defendant contends that it was as a direct result of his motion for mistrial that the court removed defendant as counsel.

This court may infer that the motion for mistrial was denied. In reviewing the denial, we may imply " 'all findings necessary to support the judgment, and [its] review is limited to whether there is substantial evidence in the record to support these implied findings.' " (*People v. Francis, supra*, 98 Cal.App.4th at p. 878.)

The trial court's implicit denial of the motion for mistrial is reviewed under the deferential abuse of discretion standard. (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.) A mistrial is properly granted when " ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " (*Ibid*.) For example, a

37

mistrial is properly granted where the prosecution commits misconduct. (*People v. Batts* (2003) 30 Cal.4th 660, 665.) The ultimate inquiry is whether some event occurred that irreparably damaged the moving party's chance for a fair trial. (*People v. Dunn, supra*, at p. 1094.)

The record shows no abuse of the trial court's discretion in denying defendant's mistrial motion. Defendant's motion followed his improper line of questioning directed to Detective Goodreau. During this questioning, defendant attempted to bring in irrelevant and misleading information regarding a purported effort to get him to take a plea deal. The court had previously warned defendant regarding the impropriety of this line of questioning, and defendant persisted in spite of that warning. Defendant then attempted to bring an untimely motion to remove the judge, and made two improper statements to bring to the jury's attention the possible punishment in the case. Any prejudice caused by this exchange was initiated by defendant, not the court.

" 'A defendant should not be permitted to disrupt courtroom proceedings without justification [citation] and then urge that same disruption as grounds for a mistrial.' [Citation.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1030.) This rule stems from the general policy that " 'a defendant is not permitted to profit from his own misconduct.' " (*Ibid*.) The trial court properly adhered to this view in implicitly denying defendant's motion for mistrial. The trial court did not abuse its discretion in declining to allow defendant to complain of the effect on the jury of his own misdeeds.

## VII.  Defendant forfeited his claim for mental health diversion

Finally, defendant argues that this court should consider remand for mental health counseling and treatment pursuant to section 1001.36.  Defendant points out that mental health counseling and domestic violence counseling were recommended several times in the preconviction report that was provided to the court before trial.

Section 1001.36 became effective June 27, 2018.  Pursuant to the statute, a criminal defendant may request diversion "[a]t any stage of the proceedings."  (§ 1001.36, subd. (b)(3).)  At the time of any such request, the court may conduct an informal hearing to determine whether the defendant "will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion."  (§ 1001.36, subd. (b)(3).)  If a prima facie case for mental health diversion is not made, the court may summarily deny the request for diversion.  (§ 1001.36, subd. (b)(3).)

Defendant fails to point to a citation to the record where he requested mental health diversion or where he presented evidence that he met the qualifications for mental health diversion.  By failing to make any request for pretrial diversion, defendant has forfeited this issue.  (*People v. Carmony* (2004) 33 Cal.4th 367, 375-376.)  Therefore, we decline to discuss it further.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

CHAVEZ

We concur:


_____, P. J.

LUI


_____, J.

ASHMANN-GERST